UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| Great American Insurance Company | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:20-cv-00053 |
| | § | |
| Code Ninjas, LLC, Beyond Gravity Media, | § | |
| Inc. and Branden Scott Matalon | § | |
| *Defendants*. | § | |

## ORIGINAL COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT

1.1     Plaintiff Great American Insurance Company ("Great American") comes before this Court pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, *et seq.*, seeking declaratory relief regarding the rights, status and legal relationship between Great American, Code Ninjas, LLC, Beyond Gravity Media, Inc. and Branden Scott Matalon (collectively referred to as "Defendants").

## I.     PARTIES

1.2     Plaintiff Great American is an insurance company incorporated under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio.  Great American was, at the time this action commenced, and still is, a citizen of the State of Ohio.  Great American is not incorporated or organized in and does not have its principal place of business in the State of Texas.  Great American is authorized to do business and is conducting business in the State of Texas.

1.3     Defendant Code Ninjas, LLC ("Code Ninjas") is a Texas limited liability company with its principal place of business and headquarters located at 11200 Broadway Street, Suite 2731, Pearland, Texas 77584.  Code Ninjas may be served at its principal place of business or through its attorney, Patrick B. Larkin, The Larkin Law Firm, PC, 11200 Broadway Street, Suite 2705, Pearland, Texas 77584.  The members of Code Ninjas, LLC are David Graham (CEO), Theparid

"Bert" Sintuphant (COO) and Nicholas Brittain (VP-Technology).  All members of the LLC are residents of Texas and can be located at 11200 Broadway Street, Suite 2731, Pearland, Texas 77584.[1]

1.4     Defendant Beyond Gravity Media, Inc. ("BGM") is a California corporation with its principal place of business located at 1772 Avendia De Los Arboles, Thousand Oaks, California 91662.  BGM may be served at its principal place of business or through its attorney, Matthew J. Soroky at LEWITT, HACKMAN, SHAPIRO, MARSHALL & HARLAN, 16633 Ventura Boulevard, 11th Floor, Encino, California 91436.

1.5     Defendant Branden Scott Matalon ("Matalon") is the sole shareholder of BGM and is a California resident.  He may be served at his residence:  4325 Riverglen Street, Moorpark, California 93021.

## II.     JURISDICTION AND VENUE

1.6     A justiciable controversy exists between Great American and Defendants as to the rights and obligations of the parties in connection with the insurance claim(s) asserted by BGM/Matalon; specifically, Great American contends that the insurance policy at issue does not provide coverage for the claims asserted in *Code Ninjas, LLC v. Beyond Gravity Media, Inc. and Branden Scott Matalon*; in the United States District Court, Southern District of Texas, Galveston Division; Case No. 3:19-cv-00303 (the "Underlying Lawsuit").  *See* **Exhibit 1**, the "Petition."

1.7     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338 because the Underlying Lawsuit arose in part under the Defend Trade Secrets Act, 18 U.S.C.

---

[1] All federal appellate courts that have addressed the issue have reached the same conclusion: like limited partnerships and other unincorporated associations or entities, the citizenship of an LLC is determined by the citizenship of all of its members.  *See Harvey v. Grey Wolf Drilling Co*., 542 F.3d 1077, 1080 (5th Cir. 2008).

§ 1836, *et seq*.  This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

1.8     This Court has personal jurisdiction over Code Ninjas because Code Ninjas regularly conducts business in Texas.  In addition, Code Ninjas has availed itself of the courts of the State of Texas as the plaintiff in the Underlying Lawsuit.

1.9     This Court has personal jurisdiction over BGM/Matalon because they engaged in business in Texas by contracting with and carrying out a business relationship with a Texas company, Code Ninjas, as further described herein.

1.10    Additionally, this Court may properly exercise personal jurisdiction over Defendants pursuant to Section 27.4 of the Franchise Agreement and Section 16.4 of the Area Development Agreement entered into between Code Ninjas and BGM/Matalon which state that any litigation under the Franchise Agreement will be brought in a court of competent jurisdiction in the state, and in (or closest to) the county where Code Ninjas' headquarters are then located (Brazoria County) and the parties consent to personal jurisdiction in these courts and waive any objection to such jurisdiction.

1.11    This Court's exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.[2]

1.12    In Section 27.1 of the Franchise Agreement, and in Section 16.1 of the Area Development Agreement, Defendants agreed that those agreements would be interpreted and construed under the laws of the State of Texas.  Therefore, Texas law applies to the Underlying Lawsuit and to this action arising out of the Underlying Lawsuit.

---

[2] *Int'l Shoe v. Washington*, 326 U.S. 310 (1945).

1.13     In addition to the choice of venue provisions identified herein, the United States District Court for the Southern District of Texas is the proper venue for this matter under 28 U.S.C. § 1391 because the Underlying Lawsuit was filed in this Court and Defendants are subject to the Court's personal jurisdiction in this District.

### III.     FACTS

1.14     Code Ninjas filed the Underlying Lawsuit in this Court on September 9, 2019 against BGM/Matalon. Petition.  In summary, the Petition alleges Code Ninjas and BGM/Matalon entered into various agreements including confidentiality agreements and covenants not to compete in order for BGM/Matalan to open a Code Ninjas franchise. After BGM/Matalon learned Code Ninja's trade secrets and other confidential information, BGM/Matalon allegedly fraudulently rescinded those agreements and opened a competitive business at the franchise site.

1.15     Code Ninjas owns and licenses educational programming centers for children teaching computer programming, coding, math, logic and teamwork under the trade name and service mark Code Ninjas and it claims to operate more than 180 education centers across the U.S.  Most of these educational centers are owned and operated by franchisees.  Code Ninjas has trademarked its name and copyrighted its materials.  Code Ninjas claims to have a proprietary "system" including methods, procedures, standards, specifications, and trademarks.

1.16     Beyond Gravity Media, Inc. ("BGM") signed an Area Development Agreement with Code Ninjas on June 29, 2018 giving BGM the right to create two educational centers in Thousand Oaks and Camarillo, California.  BGM also executed a Franchise Agreement dated June 29, 2018 (hereinafter, the Area Development Agreement and Franchise Agreement are collectively referred to as the "Agreements"). Matalon executed a separate Guarantee, Indemnification and Acknowledgment for the Agreements (the "Personal Guaranties").  Upon information and belief, BGM and Matalon opened the Code Ninjas center in Thousand Oaks, California on January 2,

2019.  A second franchise agreement was signed on July 15, 2019 regarding the operation of the Code Ninjas center in Camarillo, California.  Great American has no information as to whether the educational center in Camarillo was ever opened.

1.17    In the Underlying Lawsuit, Code Ninjas alleges BGM and Matalon received confidential and proprietary information through training programs, an annual franchise conference, and other communications.   Code Ninjas alleges that it maintained ownership of all information communicated.  Code Ninjas further alleges that all information related to its educational system is confidential and proprietary.  It further alleges that neither BGM nor Matalon may compete with the business venture offered by Code Ninjas for a three-year period pursuant to the non-compete agreement.

1.18    Upon information and belief, BGM and Matalon (through counsel) attempted to rescind the Franchise Agreement in early September 2019 and made a claim for economic damages.  The Rescission Notice alleged that Code Ninjas violated California law and sought a rescission of the Agreements.  In response, Code Ninjas filed the Underlying Lawsuit, alleging that BGM and Matalon are attempting to open and operate a competing business.  Code Ninjas alleges BGM and Matalon are attempting to market their new competitive business venture in a variety of ways including social media and other digital marketing and Code Ninjas alleges such actions were undertaken "in bad faith" and were in violation of the Agreements.  Code Ninjas also alleges BGM/Matalon acted "with fraudulent intent" and intentionally misappropriated "Code Ninjas' confidential information" and violated the covenant not to compete.

1.19    In the Underlying Lawsuit, Code Ninjas asserts the following causes of action against BGM and Matalon:

- Breach of Franchise Agreement regarding the covenants of confidentiality;
- Breach of Franchise Agreement regarding the covenants not to compete;

- Intentional misappropriation of trade secrets in violation of Defend Trade Secrets Act[3];

- Willful and malicious misappropriation of trade secrets under Texas law;

- Declaratory judgment regarding BGM/Matalon's Notice of Contractual Rescission which was delivered with fraudulent intent;

- Unjust enrichment;

- Knowing, malicious, willful and intentional unfair competition; and

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.20   In the Underlying Lawsuit, Code Ninjas also alleges fraudulent intent, unclean hands, and waiver/estoppel.  Code Ninjas seeks damages, temporary and permanent injunctive relief, specific performance, attorney's fees and costs pursuant to the Agreements and other unspecified relief.

1.21   BGM/Matalon made claims to Great American concerning the Underlying Lawsuit pursuant to Commercial General Liability Policy #PAC2897854-00 issued to Beyond Gravity Media, Inc. with effective dates of November 5, 2018 to November 5, 2019 (the "Policy").  *See* **Exhibit 2,** the "Policy."

1.22   Great American denied BGM/Matalon's claim for defense/indemnity because none of the claims asserted by Code Ninjas in the Underlying Lawsuit are covered by the Policy, as discussed fully herein.

## IV.   "EIGHT CORNERS" RULE

1.23   Texas law applies to this action pursuant to the choice of law provisions in the Agreements. Accordingly, in determining coverage, this Court must "apply Texas law as interpreted by Texas state courts."   *Gilbane Bldg. Co. v. Admiral Ins. Co*., 664 F.3d 589, 593 (5th Cir. 2011) quoting *Mid-Continent Cas. Co. v. Swift Energy Co*., 206 F.3d 487, 491 (5th Cir. 2000).  Under

---

[3] 18 U.S.C. § 1836, *et seq.*

Texas law, "insurance policies are construed according to common principles governing the construction of contracts, and the interpretation of an insurance policy is a question of law for a court to determine." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010).  The Court must interpret the contract to discern the intention of the parties as it is expressed in the policy.  *Id*.  Whether a contract is ambiguous is also a question of law.  *Id.* citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co*., 980 S.W.2d 462, 464 (Tex. 1998).  An ambiguity is not present simply because the parties advance conflicting interpretations but exists "only if the contractual language is susceptible to two or more reasonable interpretations."  *Id*. Citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

1.24    Under Texas law, the insured has the burden to prove that coverage exists.  *Wallis v. United Services Automobile Association*, 2 S.W.3d 300, 303 (Tex. App.—San Antonio 1999, pet. denied). The insurer must establish that one or more policy exclusions apply.  *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc*., 197 F.3d 720, 723 (5th Cir. 1999).  Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion.  *Id*.  The parties may satisfy their respective burdens by pointing to evidence in the record that creates a genuine issue of material fact for trial.  *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), cert. denied, 113 S.Ct. 82 (1992).

1.25    "Under Texas law, an insurer may have two responsibilities relating to coverage—the duty to defend and the duty to indemnify."  *Gilbane*, 664 F.3d at 594 citing *D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co*., 300 S.W.3d 740, 743 (Tex. 2009).  An insurer's duty to defend is determined by the application of the eight-corners rule.  *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).  "The [eight corners] rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend:  the

policy and the pleadings of the third-party claimant." *Id*. Citing *King v. Dallas Fire Ins. Co*., 85 S.W.3d 185, 187 (Tex. 2002).

1.26   An insurer's duty to defend and duty to indemnify are distinct and separate duties. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 821–22 (Tex. 1997).  Thus, an insurer may have a duty to defend but, eventually, no duty to indemnify.  Parties may secure a declaratory judgment on the insurer's duty to indemnify before the underlying tort suit proceeds to judgment.  *Farmers Texas Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 83 (Tex. 1997); *see also* TEX. CONST. Art. V, § 8 and *State Farm Fire & Cas. Co. v. Gandy,* 925 S.W.2d 696 (Tex. 1996).  "[T]he duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify." *Griffin*, 955 S.W.2d at 84.

1.27   These rules mean Great American lacks the duty to defend and indemnify either BGM or Matalon.  Great American has no duty to defend BGM or Matalon because the claims at issue in the Underlying Lawsuit fall outside the scope of coverage.  Likewise, the same reasons which negate the duty to defend also negate the duty to indemnify BGM or Matalon.

## V.   ARGUMENT

### A.   NO TRIGGER OF COVERAGE – COVERAGE A

1.28   The Petition in the Underlying Lawsuit alleges the following causes of action against BGM/Matalon:

- Breach of Franchise Agreement regarding the covenants of confidentiality;

- Breach of Franchise Agreement regarding the covenants not to compete;

- Intentional misappropriation of trade secrets in violation of Defend Trade Secrets Act;

- Willful and malicious misappropriation of trade secrets under Texas law;

- Delivery of Notice of Contractual Rescission with fraudulent intent;

- Unjust enrichment;

- Knowing, malicious, willful and intentional unfair competition; and

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.29    The Petition fails to trigger coverage under the Policy issued to BGM because there are no allegations of "bodily injury" or "property damage" as defined by the Policy.  The Policy provides as follows in the Insuring Agreement of "Coverage A":

a.    We will pay those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.
…
b.    This insurance applies to "bodily injury" and "property damage" only if:
(1)    the "bodily injury" or "property damage" is caused by an "occurrence"…

The Policy defines those terms in "Section V – Definitions" as follows:

3.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
…
17.    "Property damage" means

a.    physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

1.30    In the Insuring Agreement of "Coverage A," the Policy provides a duty to indemnify the insured for damages it is legally obligated to pay for "bodily injury" or "property damage" as defined by the Policy.  However, the allegations in the Petition do not allege "bodily injury" or "property damage" as defined by the Policy.  The Policy specifically states that electronic data is

not tangible property and thus it cannot sustain "property damage."   None of the alleged acts consist of "bodily injury" or "property damage."

1.31    Further, for "Coverage A" to apply, "bodily injury" and "property damage" must be caused by an "occurrence," which means an accident.   There has been no accident here.   The actions alleged in the Petition involve intentional conduct on the part of BGM/Matalon, thus, there is no trigger of coverage under "Coverage A" due to lack of an occurrence.

1.32    Even if Code Ninjas alleged accidental "bodily injury" or "property damage" as defined by the Policy (which it does not), the Policy contains several exclusions in "Coverage A," discussed herein, which would bar coverage for the Underlying Lawsuit.

**"EXPECTED OR INTENDED" EXCLUSION**

1.33    The Petition alleges the following intentional conduct on the part of BGM/Matalon:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the misappropriation of confidential information, violation of the covenants not to compete and other wrongful acts.  (¶58)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon registered the name "DOJOTECH" on August 21, 2019, was actively seeking to hire employees to work at Dojo Tech on or before September 6, 2019, registered a domain name for dojotech.org on August 16, 2019 which showed intent to operate a competitive business with virtually identical services to Code Ninjas, intend to use a logo confusingly similar to Code Ninjas' logo, development of Facebook and Instagram pages on July 6, 2019 showing intent to open on July 26, 2019, all of which amounted to a breach of the covenant not to compete.  (¶¶48-57)

- BGM/Matalon "cut and pasted" Code Ninja's Privacy Policy.  (¶51)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon owned, operated and engaged in a competitive business, in violation of the covenant not to compete.  (¶71)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

- BGM/Matalon knowingly, maliciously, willfully and intentionally committed actions and omissions which constitute unfair competition.  (¶102)

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.34   The Policy states as follows:

This insurance does not apply to:

a.      Expected or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the Insured…

Even if the Petition alleged accidental "bodily injury" or "property damage" (which it does not), the "expected or intended" exclusion would bar coverage *if the loss or expense was expected or intended*.

1.35   Generally, the purpose of an intentional injury exclusion is "... to prevent an insured from acting wrongfully with the security of knowing that his insurance company will 'pay the piper' for the damages." *Abramson v. Fla. Gas Transmission Co*., 908 F. Supp. 1389, 1392 (E.D. La. 1995).

1.36   Here, coverage is barred to the extent BGM/Matalan expected the injury to Code Ninjas to result from its actions.  In other words, Great American has no duty to indemnify BGM/Matalan for damage that was "highly probable" because it was "the natural and expected result" of BGM/Matalan's actions.  *Lamar Homes, Inc. v. Mid–Continent Casualty Co*., 242 S.W.3d 1, 8-9 (Tex. 2007).  The Petition clearly alleges that BGM/Matalan committed intentional acts with intended results in breaching the covenants of confidentiality and non-compete, intentionally

misappropriating    trade    secrets,    fraudulently    rescinding    the    contract,

knowingly/maliciously/willfully/intentionally engaging in unfair competition, breaching the

Agreements and the resulting breach of the Personal Guaranties.

**"CONTRACTUAL LIABILITY" EXCLUSION**

1.37    The Petition alleges BGM/Matalon agreed to indemnify Code Ninjas for attorney's fees

and other expenses incurred to enforce BGM/Matalon's obligations as follows:

> [BGM/Matalon] agreed that:  In the event [Code Ninjas] is required to employ legal
> counsel or to incur other expense to enforce any obligation of [Defendants]
> hereunder, or to defend against any claim, demand, action or proceeding by reason
> of [Defendants'] failure to perform any obligation imposed upon [Defendants] by
> this Agreement, [Code Ninjas] shall be entitled to recover from [Defendants] the
> amount of all reasonable attorneys' fees of such counsel and all other expenses
> incurred in enforcing such obligations or in defending against such claim,  demand,
> action,  or  proceeding,  whether  incurred  prior  to  or  in  preparation  for  or
> contemplation of the filing of such action or thereafter.  (¶40)

1.38    The Policy contains the following exclusion:

> b.       Contractual Liability
> "Bodily injury" or "property damage" for which the Insured is obligated to pay
> damages by reason of the assumption of liability in a contract or agreement. This
> exclusion does not apply to liability for damages:
>
> (1)       that the Insured would have in the absence of the contract or agreement; or
>
> (2)       assumed in a contract or agreement that is an "insured contract," provided
>            the "bodily injury" or "property damage" occurs subsequent to the
>            execution of the contract or agreement. …
>
> SECTION VI – DEFINITIONS  …
>
> "Insured contract" means: …
>
> f.       that part of any other contract or agreement pertaining to your
>           business…under which you assume the tort liability of another party to pay
>           for "bodily injury" or "property damage" to a third person or organization…

Even if the allegations in the Petition alleged accidental "bodily injury" or "property damage"

(which it does not), the "contractual liability" exclusion would bar coverage to the extent

BGM/Matalon assumed Code Ninja's liability in a contract or agreement, including but not limited

to the Franchise Agreement and Area Development Agreement.

**"VIOLATION OF LAW" EXCLUSION**

1.39    The Petition alleges the following violations of law by BGM/Matalan:

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

1.40    The Policy contains the following exclusion:

q.    Recording and Distribution of Material or Information in Violation of Law

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:  …

(4)    any federal, state or local statute, ordinance or regulation…that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

Even if the allegations in the Petition alleged accidental "bodily injury" or "property damage"

(which they do not), the "violation of law" exclusion bars coverage for BGM/Matalon's alleged

violations of federal and/or state regulations limiting the distribution of material.

**"DISCLOSURE OF CONFIDENTIAL INFO" EXCLUSION**

1.41    The Petition alleges the following related to the disclosure of confidential information:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies

(including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- Code Ninjas is the owner of all of the information relating to the Thousand Oaks Center, including all information relating to the customers of the center.  (¶31) Pursuant to the Franchise Agreement, BGM/Matalan agreed not to divert or attempt to divert any present or prospective business or customer of Code Ninjas to any competitor.  (¶34)  BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete. (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched. (¶¶98-99)

1.42    The Policy contains an endorsement titled "Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability – With Limited Bodily Injury Exception Form" that modifies exclusion "2.p. electronic data" (which excludes coverage for "damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data"[4]) as follows:

> 2.      Exclusions
>
> This insurance does not apply to:
>
> p.      Access or Disclosure of Confidential or Personal Information and Data-related Liability Damages arising out of:
>
> (1)     any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or …

Even if the allegations in the Petition alleged accidental "bodily injury" or "property damage" (which they do not), almost all of the allegations involve the access to or disclosure of Code Ninja's confidential information, including customer lists, trade secrets and other nonpublic information. Thus, the "disclosure of confidential information" exclusion would bar coverage for these allegations.

---

[4] "As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment."

## B.     NO TRIGGER OF COVERAGE – COVERAGE B

1.43    In "Coverage B," the insurer promises to pay sums the insured is legally obligated to pay as damages because of "personal and advertising injury."  Generally, "Coverage B" claims involve intentional acts.  In other words, a person or organization alleged to have committed a "personal or advertising injury" offense intended their actions (but not necessarily the *results* of those actions).  The intent factor distinguishes "Coverage B" claims from "Coverage A" claims which involve occurrences, i.e., accidents.

1.44    Persons and organizations have legally protected rights arising from common law, statute, state constitutions, and the U.S. Constitution.  "Coverage B" does not protect an insured from violating all the rights of another.  Rather, coverage is limited to the *specifically listed* acts of an insured.  For an act to be considered a "personal and advertising injury" offense, the act must fall within the Policy's definition of "personal and advertising injury."  If the allegations in the Petition do not fall within the Policy definition of "personal and advertising liability," they are not covered.  "Coverage B" is analogous to "named peril" coverage wherein the insured carries the burden of demonstrating an allegation falls within the definition of "personal and advertising injury."  If the insured cannot meet this burden, the insurer has no obligation to provide coverage.  Accordingly, the Policy states as follows:

    1.    Insuring Agreement

        a.    We will pay those sums that the Insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.

…

SECTION V – DEFINITIONS

…

    14.    "Personal and advertising injury" means injury…arising out of one or more of the following offenses: …

      f.     the use of another's advertising idea in your "advertisement"; or

      g.     infringing upon another's copyright, trade dress or slogan in your "advertisement".

…

1.    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

      a.     notices that are published include material placed on the Internet or on similar electronic means of communication; and

      b.     regarding web sites, only that part of a web site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

1.45    The Petition does not allege privacy violations, defamation, slander or other allegations triggering coverage under Coverage "B." The Petition does not allege any "personal and advertising injury" which is defined by the Policy as:

- Injury arising out of the use of another's advertising idea in your "advertisement;" or
- Injury arising out of infringing upon another's copyright, trade dress or slogan in your "advertisement."

1.46    Code Ninjas alleges breach of covenants of confidentiality and non-compete, misappropriation of trade secrets, fraudulent notice of contractual rescission, unfair competition, breach of the Agreements and Matalon's resulting breach of the Personal Guaranties. While the Petition makes references to BGM/Matalon's website and social media communications, Code Ninjas did not allege injury arising out of BGM/Matalon's use of their "advertising idea" in their advertisements nor injury arising out of BGM/Matalon's infringement of Code Ninja's copyright, trade dress or slogan in their advertisements.

1.47    "Advertising idea" is not defined in the Policy, so it is given its "plain, ordinary, and generally accepted meaning." *Ramsay v. Md. Am. Gen. Ins. Co.*, 533 S.W.2d 344, 346 (Tex. 1976). An "advertising idea" is a concept about the manner in which a product is promoted to the public.

*U.S. Metals, Inc. v. Liberty Mut. Grp., Inc*., 589 Fed. Appx. 659, 662 (5th Cir. 2014) (not designated for publication).  In the Petition, BGM/Matalan is accused of misappropriating Code Ninjas' confidential information/trade secrets and starting a competing business—not using Code Ninjas' "advertising ideas."  *See Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co*., 866 F.3d 254, 260 (5th Cir. 2017).

1.48    The Petition does not allege BGM/Matalan's website for Dojo Tech[5] containing a Privacy Policy identical to Code Ninjas' contains Code Ninja's "advertising idea[s]."  A privacy policy on a website does not involve how a product is promoted to the public.  While the Petition alleges BGM/Matalan copied Code Ninjas' Privacy Policy, a privacy policy is also not an "advertisement" as defined by the Policy.  A privacy policy on a web site is not about "goods, products or services for the purposes of attracting customers or supporters."  Rather, a privacy policy merely states how customer data will be utilized.  Moreover, the Petition does not allege Code Ninjas' Privacy Policy is copyrighted or otherwise protected, nor does it allege BGM/Matalan's copying of same somehow infringes Code Ninja's "copyright, trade dress or slogan."

1.49    The Petition does not allege BGM/Matalan's website for their competitive business (indicating intent to offer coding, computer programming, math skills, and robotics skills to children) contains Code Ninja's "advertising idea[s]" or infringes upon Code Ninja's "copyright, trade dress or slogan."  The Petition also does not allege BGM/Matalon's social media posts about their server, business concepts and mission[6] contain material utilizing Code Ninja's "advertising idea[s]" nor does it allege the posts infringe upon Code Ninja's "copyright, trade dress or slogan."

---

[5] *See* Petition, Exhibit G.

[6] "Last week I was fortunate enough to start beta testing the new server and it looked amazing. What a great concept this business has!" (¶55)  "We are a group of educators dedicated to teaching all things technology. We believe that learning to code is the foundation of any job skill for the future. Our mission is to prepare the problem solvers of tomorrow by building a community of learners through meaningful gameplay and coding based curriculum."  (¶56)

Finally, the Petition does not allege BGM/Matalan's job listing on Simply Hired[7] contains Code

Ninja's "advertising idea[s]" or infringes upon Code Ninja's "copyright, trade dress or slogan."

1.50    Even if Code Ninjas alleges "personal and advertising injury" as defined by the Policy

(which it does not), there are several exclusions which would bar coverage.

## "KNOWING VIOLATION" EXCLUSION

1.51    The Petition alleges the following intentional conduct on the part of BGM/Matalon:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the

---

[7] The Petition states Dojo Tech describes itself in the job listing as a "local company revolutionizing the way coding is taught by integrating world class facilities with an online curriculum."

misappropriation of confidential information, violation of the covenants not to compete and other wrongful acts.  (¶58)

- Code Ninjas is the owner of all of the information relating to the Thousand Oaks Center, including all information relating to the customers of the center.  (¶31) Pursuant to the Franchise Agreement, BGM/Matalan agreed not to divert or attempt to divert any present or prospective business or customer of Code Ninjas to any competitor.  (¶34)  BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon registered the name "DOJOTECH" on August 21, 2019, was actively seeking to hire employees to work at Dojo Tech on or before September 6, 2019, registered a domain name for dojotech.org on August 16, 2019 which showed intent to operate a competitive business with virtually identical services to Code Ninjas, intend to use a logo confusingly similar to Code Ninjas' logo, development of Facebook and Instagram pages on July 6, 2019 showing intent to open on July 26, 2019, all of which amounted to a breach of the covenant not to compete.  (¶¶48-57)

- BGM/Matalon "cut and pasted" Code Ninja's Privacy Policy.  (¶51)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon owned, operated and engaged in a competitive business, in violation of the covenant not to compete.  (¶71)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

- BGM/Matalon knowingly, maliciously, willfully and intentionally committed actions and omissions which constitute unfair competition.  (¶102)

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.52   The Policy contains the following exclusion:

This insurance does not apply to:

a.   Knowing Violation of Rights of Another

"Personal and advertising injury" caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."

…

Even if the Petition alleges "personal and advertising injury" (which it does not), the "knowing violation" exclusion bars coverage for injury caused by or at the direction of BGM/Matalan with the knowledge that the act would violate Code Ninjas' rights and would inflict said "personal and advertising injury."

1.53   The Petition clearly alleges BGM/Matalan committed intentional acts which resulted in breach of the covenants of confidentiality and non-compete, intentional misappropriation of trade secrets, fraudulent rescission of the contract, knowing/malicious/willful/intentional unfair competition, breach of the Agreements and the resulting breach of the Personal Guaranties. BGM/Matalan should have expected the injury to Code Ninjas to have resulted from its actions. The damage to Code Ninjas was "highly probable" because it was "the natural and expected result" of BGM/Matalan's actions.  *Lamar Homes, Inc. v. Mid–Continent Casualty Co*., 242 S.W.3d 1, 8-9 (Tex. 2007).  Thus, the "knowing violation" exclusion bars coverage for the allegations of knowing/intentional/malicious conduct resulting in the expected injury to Code Ninjas.

**"CONTRACTUAL LIABILITY" EXCLUSION**

1.54    The Petition alleges BGM/Matalon agreed to indemnify Code Ninjas for attorney's fees and other expenses incurred to enforce BGM/Matalon's obligations as follows:

> [BGM/Matalon] agreed that:  In the event [Code Ninjas] is required to employ legal counsel or to incur other expense to enforce any obligation of [Defendants] hereunder, or to defend against any claim, demand, action or proceeding by reason of [Defendants'] failure to perform any obligation imposed upon [Defendants] by this Agreement, [Code Ninjas] shall be entitled to recover from [Defendants] the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligations or in defending against such claim,  demand, action, or proceeding, whether incurred prior to or in preparation for or contemplation of the filing of such action or thereafter.  (¶40)

1.55    The Policy contains the following exclusion regarding assumption of liability in a contract:

> e.      Contractual Liability
>
> "Personal and advertising injury" for which the Insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement.

Even if the Petition alleges "personal and advertising injury" (which it does not), the Policy excludes coverage for "personal and advertising injury" for which BGM/Matalon assumed liability in an agreement.  The exclusion does not apply to liability for which BGM/Matalon would have in the absence of the agreement.   Great American is not aware of any theory of liability wherein BGM/Matalon would be legally responsible for Code Ninja's damages, attorney's fees and/or expenses.  Thus, the Policy would bar coverage to the extent BGM/Matalon assumed Code Ninja's liability by agreement, including but not limited to the Franchise Agreement and Area Development Agreement.

**"BREACH OF CONTRACT" EXCLUSION**

1.56    The Petition alleges BGM/Matalon breached the Franchise Agreement (which included a non-complete clause) and the Area Development Agreement and further alleges Matalon breached

the Personal Guarantees as follows:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- Code Ninjas is the owner of all of the information relating to the Thousand Oaks Center, including all information relating to the customers of the center.  (¶31)  Pursuant to the Franchise Agreement, BGM/Matalan agreed not to divert or attempt to divert any present or prospective business or customer of Code Ninjas to any competitor.  (¶34)  BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the misappropriation of confidential information, violation of the covenants not to compete and other wrongful acts.  (¶58)

- BGM/Matalon registered the name "DOJOTECH" on August 21, 2019, was actively seeking to hire employees to work at Dojo Tech on or before September 6, 2019, registered a domain name for dojotech.org on August 16, 2019 which showed intent to operate a competitive business with virtually identical services to Code Ninjas, intend to use a logo confusingly similar to Code Ninjas' logo, development of Facebook and Instagram pages on July 6, 2019 showing intent to open on July 26, 2019, all of which amounted to a breach of the covenant not to compete.  (¶¶48-57)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon owned, operated and engaged in a competitive business, in violation of the covenant not to compete.  (¶71)

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.57    The Policy contains the following exclusion:

     f.     Breach of Contract

     "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."

Even if Code Ninjas alleges "personal and advertising injury" as defined by the Policy (which it did not), the Policy excludes coverage for "personal and advertising injury" arising out of breach of contract.  The Petition alleges multiple instances of BGM/Matalon's breach of the covenants of confidentiality and non-compete, and Matalon's breach of Personal Guaranties, therefore Great

American has no duty to defend/indemnify BGM/Matalon for "personal and advertising injury" arising out of the breach of same.

**"INFRINGEMENT OF TRADE SECRET" EXCLUSION**

1.58    The Petition alleges the following regarding infringement of trade secrets:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

1.59    The Policy contains the following exclusion:

      i.      Infringement of Copyright, Patent, Trademark or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement."

However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

Even if Code Ninjas alleges "personal and advertising injury" as defined by the Policy (which it does not), there would be no coverage for the claims asserted for infringement of trade secret or other intellectual property rights.  As discussed above, there has been no allegation of infringement of copyright, trade dress or slogan in an "advertisement" so the exception to the exclusion would not apply.

## "UNAUTHORIZED USE" EXCLUSION

1.60    The Petition alleges the following relating to BGM/Matalon's actions to mislead Code Ninja's potential customers:

- Code Ninjas is the owner of all of the information relating to the Thousand Oaks Center, including all information relating to the customers of the center.  (¶31) Pursuant to the Franchise Agreement, BGM/Matalan agreed not to divert or attempt to divert any present or prospective business or customer of Code Ninjas to any competitor.  (¶34)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive

center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- Code Ninjas' goodwill and relationships with customers and potential customers will be harmed by BGM/Matalon's breaches.  (¶63)

1.61    The Policy contains the following exclusion:

l.        Unauthorized Use of Another's Name or Product

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

…

Even if Code Ninjas alleges "personal and advertising injury" as defined by the Policy (which it does not), there would be no coverage for the claims asserted against BGM/Matalon regarding tactics employed to mislead Code Ninja's potential customers.

## ACCESS OR DISCLOSURE OF CONFIDENTIAL INFO EXCLUSION

1.62    The Petition claims:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive

center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

1.63    The Policy contains an endorsement excluding "personal and advertising injury" when it arises out of access to or disclosure of confidential information or trade secrets.  The Policy endorsement titled "Exclusion – Access Or Disclosure Of Confidential Or Personal Information And Data-Related Liability – With Limited Bodily Injury Exception" states as follows:

This insurance does not apply to:

Access or Disclosure of Confidential or Personal Information

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets…or any other type of nonpublic information.  …

Thus, even if Code Ninjas alleges "personal and advertising injury" as defined by the Policy (which it does not), the "Access or Disclosure of Confidential or Personal Information" exclusion would bar coverage for the allegations of "personal and advertising injury" arising out of the access

to or disclosure of Code Ninja's confidential information.

### C.   PROFESSIONAL LIABILITY INSURANCE – NO COVERAGE

1.64    The Policy provides Professional Liability Insurance as follows:

    a.    We will pay those sums the Insured becomes legally obligated to pay as "damages" because of any act, error, or omission committed by:

        (1)    an insured in the rendering of or failure to render "Professional Services"; or

        (2)    another person or organization for whom the Named Insured is vicariously liable, in the course of that person's or organization's rendering of or failure to render "Professional Services" for or on behalf of the Named Insured;

        as part of the Named Insured's operations as a social service, human service, religious, educational, or cultural organization.

…

SECTION VI – DEFINITIONS …

4.    "Damages" means money damages awarded to compensate for harm, except those as to which applicable law prohibits liability insurance. "Damages" does not include the cost of complying with injunctive relief, declaratory relief, or other equitable actions; fines, penalties, punitive damages, exemplary damages, or any multiplied or enhanced damages; fees, deposits, or commissions; charges for goods or services, or the return, disgorgement, or reimbursement of such charges; or awards of attorneys' fees, attorneys' expenses, or other costs of making a claim or bringing a "suit."

…

10.    a.    "Professional Services" includes any service:

        1.    that involves specialized education, knowledge, labor, judgment, and skill, and is predominantly mental or intellectual (as opposed to physical or manual) in nature; and

        2.    is provided as part of the Named Insured's operations as a …educational…organization, and

        3.    is not provided by any one or more of the persons listed in d., below.

    b.    "Professional Services" includes the following:   …

        7.    educational instruction or teaching;   …

        9.    other services of the kind described in a., above, provided as part of the Named Insured's operations as a…educational…organization.

Professional Liability insurance provides a duty to indemnify for acts/omissions by the Insured in the rendering of "Professional Services" as part of the Insured's operations as an educational organization.  However, the Petition does not allege damages as a result of actions or omissions in BGM/Matalon's rendering of "Professional Services" as defined by the Policy, thus there is no trigger of coverage under the Professional Liability Insurance form.  In addition, the Professional Liability form does not provide coverage for the following types of damages sought by Code Ninjas:  costs of complying with injunctive relief, declaratory relief, or other equitable actions, including but not limited to a declaratory judgment, awards of attorneys' fees/expenses, or other costs of making a claim or bringing a "suit."  Additionally, the Policy contains several exclusions to PL coverage as discussed below.

## "EXPECTED OR INTENDED" EXCLUSION

1.65    The Petition alleges:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22)  BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain

access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete. (¶25)

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the misappropriation of confidential information, violation of the covenants not to compete and other wrongful acts. (¶58)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete. (¶47)

- BGM/Matalon registered the name "DOJOTECH" on August 21, 2019, was actively seeking to hire employees to work at Dojo Tech on or before September 6, 2019, registered a domain name for dojotech.org on August 16, 2019 which showed intent to operate a competitive business with virtually identical services to Code Ninjas, intend to use a logo confusingly similar to Code Ninjas' logo, development of Facebook and Instagram pages on July 6, 2019 showing intent to open on July 26, 2019, all of which amounted to a breach of the covenant not to compete. (¶¶48-57)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality. (¶61)

- BGM/Matalon owned, operated and engaged in a competitive business, in violation of the covenant not to compete. (¶71)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use. BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete. (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

- BGM/Matalon knowingly, maliciously, willfully and intentionally committed actions and omissions which constitute unfair competition.  (¶102)

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.66   The Policy contains the following exclusion pertaining to Professional Liability coverage:

This insurance does not apply to any:

a.   "Damages" because of any liability for any injury, loss, harm, cost, or expense, expected or intended from the standpoint of the Insured.

Great American does not have a duty to indemnify BGM/Matalan for acts/omissions in the course of its operations as an educational organization *if the loss or expense was expected or intended*. Generally, the purpose of an intentional injury exclusion is "... to prevent an insured from acting wrongfully with the security of knowing that his insurance company will 'pay the piper' for the damages." *Abramson v. Fla. Gas Transmission Co*., 908 F. Supp. 1389, 1392 (E.D. La. 1995).

1.67   Here, coverage is barred to the extent BGM/Matalan expected the injury to Code Ninjas to result from its actions.  In other words, Great American has no duty to indemnify BGM/Matalan for damage that was "highly probable" because it was "the natural and expected result" of BGM/Matalan's actions.  *Lamar Homes, Inc. v. Mid–Continent Casualty Co*., 242 S.W.3d 1, 8-9 (Tex. 2007).  The Petition clearly alleges that BGM/Matalan committed intentional acts with intended results in breaching the covenants of confidentiality and non-compete, intentionally misappropriating   trade   secrets,   fraudulently   rescinding   the   contract,

knowingly/maliciously/willfully/intentionally engaging in unfair competition, breaching the Agreements and the resulting breach of the Personal Guaranties.

**"CRIMINAL OR FRAUDULENT ACT" EXCLUSION**

1.68    The Petition alleges the following criminal or fraudulent acts by BGM/Matalon:

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the misappropriation of confidential information, violation of the covenants not to compete and other wrongful acts.  (¶58)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

1.69    The Policy contains the following exclusion:

  b.    "Damages" because of any liability arising out of any criminal or fraudulent act committed by or at the direction of the Insured. This exclusion applies regardless of:

    (1)    whether or not the criminal or fraudulent act constitutes a felony, …

The "criminal or fraudulent act" exclusion negates the duty to indemnify BGM/Matalan for the allegations in the Petition alleging fraudulent acts.

**"BREACH OF CONTRACT" EXCLUSION**

1.70    The Petition alleges the following:

- BGM/Matalon received the information and know-how to get a child-focused educational business up and running; and then to successfully operate it; including: what equipment and technology to purchase; the best design and layout for the center; the curriculum offered and the recommended pricing of the curriculum; access to marketing and advertising services and strategies (including information about upcoming advertising campaigns); access to Code Ninjas' proprietary manuals; training in the methods of operating a business focused on training children computer programming, coding, math, and other skills; training in how to differentiate a Code Ninjas center from competition; training in the promotion and sales of drop-in sessions and camps; training on brand strategies, information on current and future programming and technologies; information on vendor partnerships; and numerous other trade practices of Code Ninjas and the Code Ninjas System.  (¶22) BGM/Matalon then used that knowledge to develop a competitive business in violation of the covenants of confidentiality and non-compete.

- BGM/Matalon attended Code Ninjas' annual franchise conference (restricted to Code Ninjas' corporate staff, franchisees and vendors) where they had access to confidential information about the Code Ninjas' system, including upcoming updates to curriculum and marketing campaigns and strategies in order to gain access to confidential information for use in BGM/Matalon's competitive center under development and already advertised on social media, thus violating the covenant of confidentiality and non-compete.  (¶25)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- Defendants agreed in the Franchise Agreement that during the tenure of the Franchise Agreement and for three years thereafter, they would not compete with Code Ninjas.  (¶¶34-35)

- BGM/Matalon sent a Contractual Rescission Notice to Code Ninjas with fraudulent intent, claiming a right to rescission without first obtaining an award of rescission (¶42); BGM/Matalon delivered the Notice of Rescission with fraudulent intent and unclean hands and amounted to a baseless threat against Code Ninjas in an attempt to evade their contractual obligations and hide the

misappropriation of confidential information, violation of the covenant not to compete and other wrongful acts.  (¶58)

- BGM/Matalon's advertising of programming and classes while contemporaneously claiming they would close the Thousand Oaks Center…is indicative of the intent to convert the Thousand Oaks Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition, in violation of the covenant not to compete.  (¶47)

- BGM/Matalon registered the name "DOJOTECH" on August 21, 2019, was actively seeking to hire employees to work at Dojo Tech on or before September 6, 2019, registered a domain name for dojotech.org on August 16, 2019 which showed intent to operate a competitive business with virtually identical services to Code Ninjas, intend to use a logo confusingly similar to Code Ninjas' logo, development of Facebook and Instagram pages on July 6, 2019 showing intent to open on July 26, 2019, all of which amounted to a breach of the covenant not to compete.  (¶¶48-57)

- BGM/Matalon used, and continue to use, proprietary information obtained as franchisees of Code Ninjas to develop and open a competitive business in violation of the covenant of confidentiality.  (¶61)

- BGM/Matalon owned, operated and engaged in a competitive business, in violation of the covenant not to compete.  (¶71)

- BGM/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use.  BGM/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization, removed, or by fraud or deception obtained such information; and without authorization, conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶70, 78-81)

- BGM/Matalon acted and intend to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act, and the covenants of confidentiality and non-compete.  (¶¶85-86)

- BGM/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas' trade secrets and by trading upon Code Ninjas' goodwill and have been unjustly enriched.  (¶¶98-99)

- BGM/Matalon knowingly, maliciously, willfully and intentionally committed actions and omissions which constitute unfair competition.  (¶102)

- Breach of "Personal Guaranties" by Matalon for the Area Development Agreement and Franchise Agreement.

1.71    The Policy contains the following exclusion:

    d.    "Damages" because of any:

        (1)    Liability assumed by any insured under any contract or agreement.

        (2)    Insured's failure to perform or comply with any duty or requirement under a contract, express or implied warranty, or agreement.

    This exclusion does not apply to liability that the Insured would have in the absence of the contract or agreement.

1.72    Regarding part (1) of the exclusion, the Petition alleges BGM/Matalon agreed to indemnify Code Ninjas for attorney's fees and other expenses incurred to enforce BGM/Matalon's obligations in the Franchise Agreement as follows:

    [BGM/Matalon] agreed that:  In the event [Code Ninjas] is required to employ legal counsel or to incur other expense to enforce any obligation of [Defendants] hereunder, or to defend against any claim, demand, action or proceeding by reason of [Defendants'] failure to perform any obligation imposed upon [Defendants] by this Agreement, [Code Ninjas] shall be entitled to recover from [Defendants] the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligations or in defending against such claim,  demand, action,  or proceeding,  whether incurred prior to or in preparation for or contemplation of the filing of such action or thereafter.  (¶40)

Thus, the "contractual liability" exclusion bars coverage to the extent BGM/Matalon assumed Code Ninja's liability in an agreement, including but not limited to the Franchise Agreement and Area Development Agreement.  BGM/Matalon would not have this liability in the absence of the agreement, so the exception to the exclusion does not apply.

1.73    Regarding part (2) of the exclusion, the Policy excludes coverage for BGM/Matalan's failure to comply with any duty or requirement under an agreement.  This "breach of contract" exclusion negates the duty to indemnify BGM/Matalan for the allegations of breach of the

covenants of confidentiality and non-compete, breach of the Agreements and Matalon's resulting breach of the "Personal Guaranties."

## VI.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Great American prays that the Court will, upon a final hearing, enter a declaratory judgment pursuant to 28 U.S.C. § 2201 regarding the rights and obligations between Great American and Defendants, namely:

1.   There is no trigger of coverage pursuant to the Insuring Agreements in the Policy, thus there is no coverage under the Policy for the claims asserted in the Underlying Lawsuit;

2.   In the alternative, there is no coverage for the Underlying Lawsuit under the Policy due to the relevant policy conditions, exclusions, or endorsements;

3.   There is no duty to defend BGM and Matalon for the claims asserted in the Underlying Lawsuit under the Policy;

4.   There is no duty to indemnify BGM and Matalon for the claims asserted in the Underlying Lawsuit under the Policy;

5.   BGM and Matalon are not entitled to any claim benefits under the Policy, including but not limited to monetary payments, attorney's fees, costs and/or expenses of any kind.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

*s/Christopher W. Martin*

Christopher W. Martin
State Bar No. 13057620
Federal ID No. 13515
E-mail: martin@mdjwlaw.com

808 Travis Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

**ATTORNEY FOR PLAINTIFF**
**GREAT AMERICAN INSURANCE COMPANY**

**Of Counsel:**

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
Daniel P. Pellegrin, Jr.
State Bar No. 24100387
Federal ID No. 3480793
E-mail: pellegrin@mdjwlaw.com
808 Travis Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

**ATTORNEY FOR PLAINTIFF**
**GREAT AMERICAN INSURANCE COMPANY**