United States District Court
Southern District of Texas
**ENTERED**
September 15, 2021
Nathan Ochsner, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

| | | |
|---|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | 3:20-cv-53 |
| BEYOND GRAVITY MEDIA, INC. AND BRANDEN SCOTT MATALON, | § § § | |
| *Defendants.* | § § | |

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

In November 2018, Branden Matalon, on behalf of Beyond Gravity Media, Inc., a corporation whose sole shareholder is Matalon, negotiated with Great American Insurance Company the terms of a commercial general liability policy.[1] Matalon and Beyond Gravity are both California residents. In relevant part, the policy provides coverage for third-party claims seeking damages for

(1) "bodily injury" or "property damage" caused by an "occurrence,"
(2) a "personal advertising injury," and

---

[1] Dkt. 1 ¶ 1.5; Dkt. 1-1 ¶ 3.

1

(3) the rendition of "professional services" for which the insured is legally liable.[2]

The policy also includes various exclusion clauses.

Earlier that same year, Beyond Gravity and Matalon contracted with Code Ninjas LLC—a Texas  limited-liability company who operates and licenses centers that teach computer programming, coding, math, logic, and teamwork to children—to open franchises of Code Ninjas's centers.[3] Code Ninjas has developed a unique curriculum and owns the trademark CODE NINJAS® and the "Ninja Logo."[4]

A little over a year later, Beyond Gravity and Matalon attempted to rescind the franchise contracts, alleging breaches of California law, and claimed economic damages. Code Ninjas responded by filing an action in this court.[5] In its complaint in that suit, Code Ninjas alleges that Beyond Gravity and Matalon received Code Ninjas's confidential and proprietary information through its training programs, annual franchise conference, and other communications.[6] Code Ninjas alleges that

---

[2] *Id.* at 135, 141, 171.

[3] Dkt. 1-1 ¶¶ 1, 9–21. Whether these agreements were made in Texas or California is be contested. *Compare* Dkt. 35 at 3, *with* Dkt. 31 at 6.

[4] Dkt. 1-1 ¶ 11.

[5] *See generally* Dkt. 1-1.

[6] *Id.* ¶¶ 22–28.

Beyond Gravity and Matalon misappropriated Code Ninjas's confidential information and trademark to create and advertise (through a website, social-media pages, and a job listing) a competing education center called "Dojo Tech" or "CoDojo" in contravention of covenants of confidentiality and not to compete.[7] Code Ninjas further alleges entitlement to attorneys' fees for any breach of agreement by Beyond Gravity and Matalon. Ultimately, Code Ninjas and Beyond Gravity and Matalon reached a confidential settlement agreement, and Code Ninjas voluntarily dismissed the complaint.[8]

Before Code Ninjas and Beyond Gravity and Matalon settled, Great American brought this action for declaratory judgment. Great American contends that because the allegations in the underlying action do not fall under the policy's coverage, it has no duty to either defend or indemnify Beyond Gravity and Matalon. Great American and the defendants Beyond Gravity and Matalon have both moved for summary judgment. Dkts. 30, 31.

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[7] *Id.* ¶¶ 28–37, 48–58.

[8] Stipulation for the Entry of Dismissal, *Code Ninjas, LLC v. Beyond Gravity Media Inc. et al.*, No. 3:19-cv-303, Dkt. 34 (S.D. Tex. Apr. 24, 2020).

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[9] An issue is material if its resolution dictates the outcome of the action.[10] A fact is in dispute if a reasonable jury could return a verdict for the non-movant.[11] When cross-motions for summary judgment have been filed, courts "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[12]

After reviewing the parties' briefing and the law, the court denies the defendants' motion for summary judgment and grants Great American's.

## I.     Choice of Law

To start, the parties disagree whether California or Texas law should control the policy's interpretation. Great American argues that Texas law controls because in the underlying lawsuit Code Ninjas, Beyond Gravity, and Matalon agreed that Texas law would control the contracts between them, so Texas law should extend to the interpretation of the policy, too.[13] And, Great American continues, Texas is the

---

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).

[10] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[11] *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 504 (S.D. Tex. 2015).

[12] *Green v. Life Ins. Co. of N. Am.*, 754 F.3d 324, 329 (5th Cir. 2014).

[13] *See* Dkt. 1-1 ¶ 5.

"principal location" of the particular risk involved, so Texas has a greater interest in the interpretation of the policy and the underlying lawsuit.

In response, Beyond Gravity and Matalon note that the policy, which lacks any choice-of-law provision, implicates many more California contacts: the acts alleged in the underlying lawsuit all took place in California; the policy was negotiated, issued, and paid for in California; and as Beyond Gravity is a California corporation and resident, any benefits would be paid out in that state.

Because Texas is the forum state, its choice-of-law rules apply.[14] A choice-of-law analysis is only necessary, however, if the respective states' laws conflict.[15] When there is a conflict, Texas courts apply the "most significant relationship" test of the Restatement (Second) of Conflict of Laws § 188 to contracts disputes.[16]

In determining an insurer's duty to defend, Texas uses the "eight-corners" rule.[17] Under this rule, "the duty to defend is determined by the claims alleged in the

---

[14] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990).

[15] *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990).

[16] *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 735 (Tex. 1997).

[17] *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006).

[underlying] petition and the coverage provided in the policy."[18] The Supreme Court of Texas has repeatedly declined to recognize an exception to the eight-corners rule,[19] but some Texas appellate courts have and considered extrinsic evidence under "limited circumstances involving pure coverage questions."[20] Nevertheless, "[i]n deciding the duty to defend, the court should not consider extrinsic evidence from either the insurer or the insured that contradicts the allegations of the underlying petition."[21]

Like Texas, California also directs courts to measure the insurance policy against the underlying complaint to determine whether the insurer's duty to defend

---

[18] *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009); *GuideOne*, 197 S.W.3d at 308 ("The [eight-corners] rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the third-party claimant.").

[19] *Pine Oak*, 279 S.W.3d at 654.

[20] *GuideOne*, 197 S.W.3d at 310 (citing *Int'l Serv. Ins. Co. v. Boll*, 392 S.W.2d 158, 160 (Tex. App.—Houston 1965, writ ref'd n.r.e.)); *see also Northfield Ins. Co. v. Loving Home Care, Inc.*, 363 F.3d 523, 531 (5th Cir. 2004) (relying on an "*Erie* guess" to hold that were the Supreme Court of Texas to recognize an exception to the eight-corners rule, it would be limited to cases where "it is initially impossible to discern whether coverage is potentially implicated *and* when the extrinsic evidence goes solely to a fundamental issue of coverage which does not overlap with the merits of or engage the truth or falsity of any facts alleged in the underlying case"); *see also, e.g., Weingarten Realty Mgmt. Co. v. Liberty Mut. Fire Ins. Co.*, 343 S.W.3d 859, 865 (Tex. App.—Houston [14th Dist.] 2011, pet. denied.)

[21] *Pine Oak*, 279 S.W.3d at 655.

is triggered.[22] California law allows courts to consider facts extrinsic to the underlying complaint, but only in the narrow circumstances "when they reveal a possibility that the claim may be covered by the policy."[23] Thus, both states' laws direct courts to first consider the insurance policy and the underlying complaint.

Indeed, Beyond Gravity and Matalon contend that Great American's duty to defend and indemnify is clear under either Texas or California law.[24] And, while it appears that by arguing that California law applies the defendants intended to refer the court to some extrinsic information not found in the underlying complaint's allegations, the defendants list only the policy, the underlying complaint, and an affidavit from Matalon as their summary-judgment evidence. Great American concurs that neither state's law changes the outcome—though it believes coverage is clearly precluded.[25] Because there is no conflict in the law in this case, and the court need not consider, and has not considered, extrinsic evidence to determine the extent of coverage, the court will apply Texas law's eight-corners rule.

---

[22] *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) ("Thus, in determining whether allegations in a particular complaint give rise to coverage under a CGL policy, courts must consider both the occurrence language in the policy, and the endorsements broadening coverage, if any, included in the policy terms.").

[23] *Id.* at 19.

[24] Dkt. 31 at 3.

[25] Dkt. 35 at 3.

## II.    Is there a trigger of coverage?

"[T]he interpretation of an insurance policy is a question of law for a court to determine."[26] Texas law recognizes that insurers have two separate insurance-coverage duties: a duty to defend and a duty to indemnify.[27] Under the eight-corners rule, the "alleged facts within the four corners of the latest amended pleading and the plain language within the four corners of the insurance policy are the focus of the court's inquiry in determining a duty to defend."[28]

Any doubt in coverage is to be resolved in favor of the insured.[29] "If a complaint potentially includes a covered claim, the insurer must defend the entire suit."[30] In other words, "[e]ven if the plaintiff's complaint alleges multiple claims or claims in the alternative, some of which are covered under the policy and some of which are not, the duty to defend arises if at least one of the claims in the complaint

---

[26] *Am. Int'l Specialty Lines Ins. Co.*, 620 F.3d at 562.

[27] *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 594 (5th Cir. 2011).

[28] *Columbia Lloyds Ins. Co. v. Liberty Ins. Underwriters, Inc.*, 3:17-cv-005, 2018 WL 1569718 (S.D. Tex. Mar. 14, 2018), *report and recommendation adopted*, 3:17-cv-005, 2018 WL 1561816 (S.D. Tex. Mar. 30, 2018); *see Ewing Constr. Co. v. Amerisure Ins. Co., Inc.*, 420 S.W.3d 30, 33 (Tex. 2014); *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010).

[29] *See Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997); *Nautilus Ins. Co. v. Zamora*, 114 F.3d 536, 538 (5th Cir. 1997).

[30] *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008).

is facially within the policy's coverage."[31] On the other hand, the insurer may be absolved of the duty to indemnify for the same reasons that negate the duty to defend.[32]

If the insured first proves the existence of coverage, the insurer must then establish that a policy exclusion applies.[33] If it does, the burden returns to the insured to show an exception to the exclusion.[34]

The complaint in the underlying suit asserts the following causes of action:

- Breach of franchise agreement regarding covenant of confidentiality;

- Breach of franchise agreement regarding covenant not to compete;

- Intentional, willful, and malicious misappropriation of trade secrets in violation of Defend Trade Secrets Act and under Texas law;

- Declaratory judgment regarding Beyond Gravity/Matalon's notice of contractual rescission which was delivered with fraudulent intent;

- Unjust enrichment;

---

[31] *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 393 (5th Cir. 1995) (citing *Rhodes v. Chi. Ins. Co.*, 719 F.2d 116, 119 (5th Cir. 1983)).

[32] *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex. 1997).

[33] *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015); *Century Sur. Co. v. Hardscape Const. Specialties Inc.*, 578 F.3d 262, 265 (5th Cir. 2009); *Federated Mut. Ins. Co. v. Grapevine Excav., Inc.*, 197 F.3d 720, 723 (5th Cir. 1999).

[34] *JAW*, 460 S.W.3d at 603.

- Knowing, malicious, willful, and intentional unfair competition; and
- Breach of "personal guaranties" by Matalon.[35]

Great American argues that is has neither the duty to defend nor indemnify because all of these claims fall outside the policy's terms.

The policy has three grants of coverage, and while the defendants broadly assert that Code Ninjas's allegations "clearly trigger coverage under one or more of th[e] coverage parts," they limit their arguments to Coverage Part B, which concerns a "personal and advertising injury." The court will nevertheless consider each grant of coverage in turn.

### A. Coverage Part A

Under "Coverage Part A" Great American agreed that—

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

*       *       *

b. This insurance applies to "bodily injury" and "property damage" only if:

1. The "bodily injury" or "property damage" is caused by an "occurrence . . . ."[36]

---

[35] Dkt. 1-1 ¶¶ 59–116.

[36] Dkt. 1-2 at 135.

The policy defines "bodily injury" and "property damage" as follows:

3.    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

17.   "Property Damage" means

a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.[37]

After comparing Coverage Part A to the underlying complaint, the court agrees that none of the allegations in the underlying complaint concern any bodily injuries or injuries to tangible property. Therefore, Coverage Part A is not triggered.

### B. Professional Liability Insurance Form

Great American promised in the policy's "Professional Liability" section to indemnify and defend the insured in the rendering of "professional services" as part of the insured's operations as an educational organization—

## SECTION I - PROFESSIONAL LIABILITY COVERAGE

## 1. Insuring Agreement

---

[37] *Id.* at 150–53.

    a.     We will pay those sums the Insured becomes legally obligated to pay as "damages" because of any act, error, or omission committed by:

        (1)    an insured in the rendering of or failure to render "Professional Services"; or

        (2)    another person or organization for whom the Named Insured is vicariously liable, in the course of that person's or organization's rendering o f or failure to render "Professional Services" for or on behalf of the Named Insured; as part of the Named Insured's operations as a social service, human service, religious, educational, or cultural organization.[38]

*    *    *

## SECTION VI - DEFINITIONS

4. **"Damages"** means money damages awarded to compensate for harm, except those as to which applicable law prohibits liability insurance. "Damages" does not include the cost of complying with injunctive relief, declaratory relief, or other equitable actions; fines, penalties, punitive damages, exemplary damages, or any multiplied or enhanced damages; fees, deposits, or commissions; charges for goods or services, or the return, disgorgement, or reimbursement of such charges; or awards of attorneys' fees, attorneys' expenses, or other costs of making a claim or bringing a "suit."

10.    a.    **"Professional Services"** includes any service:

        (1)    that involves specialized education, knowledge, labor, judgment, and skill, and is predominantly mental or intellectual (as opposed to physical or manual) in nature; and

---

[38] Dkt. 1-2 at 171.

(2)   is provided as part of the Named Insured's operations as a social service, human service, religious, educational, or cultural organization, and

(3)   is not provided by any one or more of the persons listed in d., below.

b.   "Professional Services" includes the following:

. . .

(7)   educational instruction or teaching;

. . .

(9)   other services of the kind described in a., above, provided as part of the Named Insured's operations as a social service, human service, religious, educational, or cultural organization.[39]

Code Ninjas did not allege damages because of Beyond Gravity's or Matalon's acts or omissions rendering "Professional Services" as the policy defines that term. Accordingly, coverage under the professional-liability form is not triggered.

### C. *Coverage Part B*

In "Coverage Part B," Great American promised to pay sums the insured is legally obligated to pay as damages because of a "personal and advertising injury."[40] Further, Great American promised it would "defend the Insured against any 'suit' seeking those damages."[41]

---

[39] *Id.* at 178–79.

[40] *Id.* at 141.

[41] *Id.*

13

Coverage Part B defines "Personal and advertising injury" and "advertising" as—

> 14.   "Personal and advertising injury" means injury . . . arising out of one or more of the following offenses:
>
>> f.   the use of another's advertising idea in your "advertisement"; or
>>
>> g.   infringing upon another's copyright, trade dress or slogan in your "advertisement."[42]

And as for "advertisement"—

> 1.   "Advertisement" means a notice that is broadcast or published to the general public or specific marker segments about your goods, products, or services for the purpose of attracting customers or supporters. For the purposes of this definition:
>
>> a.   notices that are published include material placed on the Internet or on similar electronic means of communication; and
>>
>> b.   regarding web sites, only that part of a web site that is about your good, products or services for the purposes of attracting customers or supporters is considered an advertisement.[43]

---

[42] *Id.* at 152. Though the policy does not define "trade dress," the Fifth Circuit has defined it as the "total image and overall appearance of a product and may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 251 (5th Cir. 2010).

[43] Dkt. 1-2 at 150.

The parties agree that an "advertising idea" is, based on its plain meaning, a "concept about the manner in which a product is promoted to the public."[44]

Great American contends that though Code Ninjas's allegations refer to Beyond Gravity and Matalon's website and social media, the allegations do not state an injury arising out of Beyond Gravity's and Matalon's "advertising" or infringement of Code Ninjas's copyright, trade dress, or slogan.

In the same vein, Great American argues that the misappropriation of Code Ninjas's confidential information and trade secrets, and using them to start a competing business, do not amount to using Code Ninjas's "advertising ideas." For example, the allegation that Beyond Gravity and Matalon copied Code Ninjas's privacy policy on the "Dojo Tech" website is not the use of an "advertising idea" because a privacy policy plays no role in how a product is promoted to the public. Great American maintains the same is true for Code Ninjas's allegations concerning Beyond Gravity's and Matalon's social-media posts about their server, business concepts and mission, and for their job listing on Simply Hired.[45]

---

[44] Dkt. 30 at 15 (quoting *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 589 F. App'x 659, 662 (5th Cir. 2014) (per curiam)); Dkt. 31 at 13 (citing *Laney v. Chiro. & Sports Therapy, P.C. v. Nationwide Mut. Ins. Co.,* 866 F.3d 254, 259–60 (5th Cir. 2017)).

[45] *See* Dkt. 1-1 ¶¶ 55–56.

But Great American's arguments are unpersuasive. The underlying complaint repeatedly alleges that Beyond Gravity and Matalon appropriated Code Ninjas's branding to redirect students to Beyond Gravity and Matalon's competing school. For example, the underlying complaint alleges Beyond Gravity and Matalon had "access to [Code Ninjas's] marketing and advertising services and strategies (including information about upcoming advertising campaigns),"[46] and they "attended NinjaCon to gain access to confidential information for use in [their] competitive center under development and already advertised on social media."[47]

Code Ninjas further alleges its investigator discovered, after Beyond Gravity and Matalon served a notice to rescind their franchise contracts, that Beyond Gravity and Matalon were continuing to "advertise the CODE NINJAS® System and the Thousand Oaks CODE NINJAS® Center." The investigator allegedly even picked up an advertising brochure from Beyond Gravity and Matalon's center that used Code Ninjas's branding.[48] Code Ninjas further alleges that

> [Beyond Gravity's and Matalon's] advertising of programming and
> classes while contemporaneously claiming they would close the
> Thousand Oaks CODE NINJAS® Center raised concerns to Code
> Ninjas because such conduct is indicative of the intent to convert the

---

[46] *Id.* ¶ 22.

[47] *Id.* ¶ 25.

[48] *Id.* ¶ 46.

> Thousand Oaks CODE NINJAS® Center to a competitive business and retain the customers who were induced to visit the competitive center through deception and unfair competition. After further investigation, Code Ninjas learned this to be true.

Code Ninjas also alleges that Beyond Gravity and Matalon registered the trademark "DOJOTECH," and used that trademark in a job posting, a website, and social-media pages. The defendants also allegedly created a Facebook and Instagram page using the name "CoDojo."[49] Great American's argument that the defendants' alleged digital presence and roll-out of Dojo Tech do not amount to "advertisements" is unconvincing. Business websites and social-media pages are by design digital storefronts—their entire point is to garner attention and attract customers.

Even more, the defendants' Dojo Tech moniker is obviously an "idea" inspired by Code Ninjas's branding. Again, an advertising idea is a "*concept* about the manner in which a product is promoted to the public."[50] Both Code Ninjas and Dojo Tech allegedly advertised the same type of coding, computer-programming, math, and robotics classes to children.[51] The defendants, like Code Ninjas, tried to

---

[49] *Id.* ¶ 54.

[50] Dkt. 30 at 15 (citing *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 589 F. App'x 659, 662 (5th Cir. 2014) (per curiam) (emphasis added)).

[51] Dkt. 1-1 ¶ 52.

appeal to potential students by invoking a Japanese martial-arts theme. The defendants simply replaced "Code" with "Tech" and "Ninja" with "Dojo." In Japanese, "dojo" refers to "a school for training in various arts of self-defense (such as judo or karate),"[52] and a "ninja" is "a person trained in ancient Japanese martial arts and employed especially for espionage and assassinations."[53] Code Ninjas even compared screenshots of the Dojo Tech mark with Code Ninjas's, both of which feature a ninja cartoon character amidst the lettering.[54] The court thus concludes that the insured has established coverage under Part B.

## III.   Do Any of the Policy's Exclusions Apply?

While Code Ninjas's allegations trigger coverage under Part B, Great American contends that several exclusions in the policy absolve them of a duty to defend. Those exclusions are (1) knowing violation, (2) contractual liability, (3) infringement of intellectual property, (4) breach of contract, (5) unauthorized use, and (6) access or disclosure of confidential information.

---

[52] *Judo*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/dojo (last visited Sept. 3, 2021)

[53] *Ninja*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ninja (last visited Sept. 3, 2021).

[54] Dkt. 1-1 ¶ 53.

In assessing the applicability of any exclusions, a court still acts within the bounds of the eight-corners rule and continues to construe the policy's terms "according to general rules of contract construction to ascertain the parties' intent."[55] Moreover, the court must determine whether the cited exclusions would relieve the insurer's duty to defend for *all* the underlying claims because, once coverage is triggered, the insurer must defend the entire suit.[56] The court examines each exclusion in turn.

### A. *"Knowing Violation" Exclusion*

Coverage Part B excludes coverage for a "'[p]ersonal and advertising injury' caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'"[57] Great American argues that the following allegations implicate this exclusion because they allege the defendants knowingly violated Code Ninja's rights:

- Beyond Gravity/Matalon attended Code Ninjas's annual franchise conference (restricted to Code Ninjas's corporate staff, franchisees, and vendors) where they had access to confidential information about the Code Ninjas system, including upcoming updates to curriculum and marketing campaigns and strategies to obtain further information for use in Beyond Gravity/Matalon's competitive center under

---

[55] *JAW*, 460 S.W.3d at 603.

[56] *Northfield Ins. Co.*, 363 F.3d at 528.

[57] Dkt. 1-2 at 141.

development and already advertised on social media, thus violating the non-competition and confidentiality covenants. Dkt. 1-1¶ 25.

- Beyond Gravity/Matalon registered the name "DOJOTECH" on August 21, 2019; actively sought to hire employees to work at Dojo Tech on or before September 6, 2019; registered a domain name for dojotech.org on August 16, 2019, which showed intent to operate a competitive business with virtually identical services to Code Ninjas; intended to use a logo confusingly similar to Code Ninjas's logo; and developed Facebook and Instagram pages on July 6, 2019, showing an intent to open on July 26, 2019—all of which amounted to a breach of the covenant not to compete. Dkt. 1-1 at ¶¶ 48–57.

- Beyond Gravity/Matalon knew or had reason to know that they acquired knowledge of trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets and to limit their use. Beyond Gravity/Matalon, with the intent to convert trade secrets and intending or knowing that the offense would injure Code Ninjas, stole, or without authorization removed, or by fraud or deception obtained such information; and without authorization conveyed such information to Dojo Tech which violated the Defend Trade Secrets Act, and the non-competition and confidentiality covenants . Dkt. 1-1 at ¶¶ 70, 78–81.

- Beyond Gravity/Matalon acted and intended to continue to act to misappropriate trade secrets of Code Ninjas in violation of the Uniform Trade Secrets Act and the non-competition and confidentiality covenants. Dkt. 1-1 ¶¶ 85–86.

- Beyond Gravity/Matalon have received and are receiving a benefit from Code Ninjas by using Code Ninjas's trade secrets and by trading upon Code Ninjas's goodwill and have been unjustly enriched. Dkt. 1-1 ¶¶ 98–99.

- Beyond Gravity/Matalon knowingly, maliciously, willfully and intentionally committed acts and omissions which constitute unfair competition. Dkt. 1-1 ¶ 102.

The court agrees that the complaint across the board alleges that Beyond Gravity and Matalon knowingly and intentionally appropriated Code Ninjas's trade secrets and violated the franchise agreements' covenants to maintain confidentiality and not compete. Indeed, none of Code Ninjas's allegations accuses the defendants of mere negligence. The "knowing violation" exclusion thus excuses Great American from the duty to defend for the bulk of Code Ninjas's claims—for breach of the non-competition and confidentiality covenants, intentional misappropriation of trade secrets, fraudulent rescission of the contract, knowing/malicious/willful/intentional unfair competition, and breach of the agreements and the resulting breach of the personal guaranties. The defendants retort that a "jury may conclude that the defendants' uses were without knowledge of a right of Code Ninjas" or that the "jury could agree that the defendants were unaware" of Code Ninjas's rights. But speculative jury findings are beside the point. The court must measure the plain meaning of the policy's exclusions against the underlying complaint's allegations to determine whether an exclusion absolves an insurer of the duty to defend.[58]

---

[58] *See Northfield*, 363 F.3d at 528.

## B. *"Contractual Liability" Exclusion*

Coverage Part B excludes coverage for a "'[p]ersonal and advertising injury' for which the Insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the Insured would have in the absence of the contract or agreement."[59]

Code Ninjas does not allege in the underlying complaint that the defendants promised to *assume* any liability. Indeed, a promise to assume liability is not equivalent with an allegation of breach of contract. "Assumption of Liability" is not defined in the policy. Black's Law Dictionary, however, defines "assumption" as "[t]he act of taking (esp. someone else's debt or other obligation) for or on oneself; the agreement to so take contract to assume liability."[60] "Liability," in turn, is defined as "[t]he quality, state, or condition of being legally obligated or accountable . . . ."[61] Taken together, the plain meaning for "assumption of liability" suggests coverage is excluded only in the event the defendants agreed to take on Code Ninjas's liability for a "personal and advertising injury."

---

[59] Dkt. 1-2 at 142.

[60] *Assumption*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[61] *Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019).

22

Such a promise is absent here. Code Ninjas did not allege that the franchise agreements featured an indemnity or hold harmless agreement. Accordingly, this exclusion does not apply.

## C. *"Breach of Contract" Exclusion*

Coverage Part B excludes coverage for a "'[p]ersonal and advertising injury'" arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement.'"[62]

As earlier detailed, Code Ninjas repeatedly alleges that Beyond Gravity and Matalon breached the non-competition and confidentiality covenants and that Matalon breached a personal guaranty. The exception to the exclusion—"except an implied contract to use another's advertising idea in your 'advertisement'"[63]—does not apply because there are no allegations concerning an implied contract. And the defendants allegedly forsook the franchise agreements that allowed them to use Code Ninjas's confidential information and branding. Thus, this exclusion applies and relieves Great American of the duty to defend against Code Ninjas's breach-of-contract claims.

---

[62] Dkt. 1-2 at 142.

[63] *Id.*

### D. *"Infringement of Copyright, Patent, Trademark, or Trade Secret" Exclusion*

Coverage Part B excludes coverage for

> "[p]ersonal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement." However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.[64]

The underlying complaint alleges at numerous points that the defendants infringed on Code Ninjas's trade secrets and trademark.[65] So at first glance it seems that this exclusion would relieve Great American of the duty to defend the defendants against those claims. But the "infringement" exclusion seems at least partly at odds with the initial grant of coverage. Again, Coverage Part B promises a defense against a "suit" alleging a "personal and advertising injury," which is "the use of another's advertising idea in your 'advertisement'" or infringing upon another's copyright, trade dress or slogan in your 'advertisement.'"[66] Yet, in the policy's next breath it excludes coverage for claims arising out of the infringement of

---

[64] *Id.*

[65] *See* Dkt. 1-1 at ¶¶ 22, 25, 61, 70, 78–86, 98–99.

[66] Dkt. 1-2 at 153.

24

"copyright, patent, trademark, trade secret or other intellectual property rights."[67] Coverage for infringement of another's "copyright" is thus granted on the one hand, and then seemingly pulled back by the other.

But Code Ninjas never alleges any copyright infringement; it alleges misappropriation of trade secrets and trademark violations. Putting aside the contradictory treatment of copyright-infringement allegations, the policy's Coverage Part B clauses and the "infringement" exclusion are in harmony, and they ultimately reflect that the parties did not intend for a "personal and advertising injury" to extend to allegations for infringement of trademarks or misappropriation of trade secrets.[68]

The clarification provided by the "exception" to the "infringement" exclusion makes this apparent:

> Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement." However, this exclusion does not apply to infringement, in your "advertisement," of copyright, trade dress or slogan.

The repeated use of the word "exclusion" in the second sentence is best read to refer to the immediately preceding sentence. This second sentence reaffirms, even if a bit

---

[67] *Id.* at 142.

[68] *City of Coll. Station, Tex. v. Star Ins. Co.*, 735 F.3d 332, 337 (5th Cir. 2013) (citing Zurich, 268 S.W.3d at 491).

25

clumsily when compared to the "infringement" exclusion clause, that allegations concerning "copyright, trade dress or slogan" are expressly extracted from the exclusion's catch-all term: "other intellectual property rights."

In short, the court takes the initial grant of coverage at its word: coverage is available only for the use of another's "advertisement idea" or for the infringement of another's copyright, trade dress, or slogan in the defendant's advertisement. And as the "infringement" exclusion says, the policy does not cover allegations of infringement of trade secrets and trademarks. Accordingly, the "infringement" exclusion relieves Great American of its duty to defend against Code Ninjas's misappropriation-of-trade-secrets and trademark-infringement claims.

### E. *"Unauthorized Use" Exclusion*

Coverage Part B excludes coverage for

> "[p]ersonal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

Code Ninjas makes numerous allegations that the defendants misled Code Ninjas's customers by continuing to use Code Ninjas's branding and curriculum after rescinding the franchise agreements.[69] This exclusion thus relieves Great

---

[69] *See* Dkt. 1-1 at ¶¶ 31, 34, 47, 51, 63.

American of the duty to defend against allegations or claims resting on the defendants' alleged unauthorized use of Code Ninjas's name, product, or any other tactics to mislead Code Ninjas's customers.

### F. *"Access or Disclosure of Confidential Information" Exclusion*

The policy contains an endorsement excluding "personal and advertising injury" when it arises out of access to or disclosure of confidential information or trade secrets:

> This insurance does not apply to:
>
> "[p]ersonal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.[70]

Code Ninjas repeatedly alleges that the defendants had access to its confidential information, used that information in its own competitive business, and advertised that business on social media, all in violation of the franchise agreements.[71] This exclusion thus discharges Great American of its duty to defend against Code Ninjas's allegations of the defendants' misuse of its confidential information and trade secrets.

---

[70] Dkt. 1-2 at 127.

[71] Dkt. 1-1 at ¶¶ 25, 61, 70. 78–81.

27

Great American has shown as a matter of law that express policy exclusions preclude coverage for all of Code Ninjas's allegations and claims.[72] Accordingly there is no duty to defend Beyond Gravity and Matalon in the underlying action.

## IV. Duty to Indemnify

Because Great American has established that the policy's exclusions completely relieve it of the duty to defend, Great American correspondingly has no duty to indemnify.[73]

*      *      *

For the reasons above, the court grants Great American's motion for summary judgment (Dkt. 30) and denies Beyond Gravity and Matalon's (Dkt. 31). The court therefore declares—

(1)   Under the policy's conditions, exclusions, and endorsements, there is no coverage for the claims against the defendants in the underlying lawsuit.

---

[72] *See id.* ¶¶ 59–116.

[73] *See Farmers*, 955 S.W.2d at 84. The policy, moreover, expressly does not cover some of the types of damages sought by Code Ninjas: costs of complying with injunctive relief, declaratory relief, or other equitable actions, including awards of attorneys' fees and expenses, or costs of making a claim or bringing a suit. Dkt. 1-2 at 178–79.

(2)    Great American owes no duty to defend the defendants against the claims in the underlying lawsuit.

(3)    The defendants are not entitled to any benefits under Great American's policy arising from the claims in the underlying action, including but not limited to monetary payments, attorneys' fees, costs, and any other expenses.

Final judgment will be entered separately.

Signed on Galveston Island this 15 day of September, 2021.


                                         Jeffrey Vincent Brown
                                         United States District Judge